Bobby J. WRIGHT, Plaintiff,

v.

CITY OF CANTON, OHIO,
et al., Defendants.

No. 5:00–CV–2717.

United States District Court,
N.D. Ohio,
Eastern Division.

April 9, 2001.

Chris T. Nolan, Peter D. Janos, Perantinides & Nolan, Akron, OH, for Plaintiffs.

John S. Coury, Mariella Mestel, Canton, OH, Leo R. Ward, Ward & Associates, Cleveland, OH, Defendants.

## ORDER

GWIN, District Judge.

Defendant Canton Police Officers Eric Jackson and Jennifer Vinesky move for summary judgment on the 42 U.S.C. § 1983 and related state claims brought against them by Plaintiff Bobby Wright [Doc. 32]. Moving separately, Defendant City of Canton also seeks judgment on Wright's § 1983 claim [Doc. 31]. Because Wright has offered sufficient evidence in support of his federal and state claims, the Court denies both motions for summary judgment.

I

In this civil rights action, Plaintiff Bobby Wright says Defendant Canton Police Officers Eric Jackson and Jennifer Vinesky used excessive force in effecting his arrest. He also contends Defendant City of Canton ratified this unconstitutional use of force by failing to adequately investigate

Jackson and Vinesky's conduct. As the result of this purported unconstitutional use of force, Wright says he suffered major head injuries and partial blindness. Defendants deny Wright's allegations.

Plaintiff Wright says Officer Jackson badly beat him in the garage of the Canton Police Department following his arrest on November 3, 1999. This arrest occurred shortly after midnight. At that time, Bobby Wright walked into a Dairy Mart store in Canton, Ohio. He complained to the store clerk that he had just been robbed and had his car stolen by a band of young males. The clerk phoned 911; Officers Jackson and Vinesky arrived on the scene shortly thereafter.

Outside of the Dairy Mart, Jackson and Vinesky discussed the robbery and car theft with Wright. He appeared intoxicated and confused. And Vinesky recalled taking a similar complaint from Wright one month earlier:

Jackson and Vinesky soon determined that no robbery or theft had occurred. They offered to drive Wright home. Possibly fearing arrest, Wright refused and began yelling at the officers. When he ignored repeated orders to leave the scene, Jackson and Vinesky arrested Wright for disorderly conduct.

Wright allegedly resisted arrest. After a scuffle, Jackson sprayed Wright's face with oleoresin capiscum (OC) spray, similar to pepper spray. The officers then handcuffed Wright and placed him in their patrol car.

After arresting Wright, Jackson and Vinesky decided not to book Wright into jail. Instead, they say they decided to issue Wright a summons for disorderly conduct. They took Wright to the Canton Police Department to obtain the complaint forms for issuing the summons. Because Wright continued to experience pain from the OC spray, they would also let Wright rinse his face at the police department.

The officers pulled their patrol car into the basement parking deck of the department. After Vinesky retrieved the complaint forms, both officers escorted Wright to the basement restroom area. Once there, they removed Wright's handcuffs and allowed him to rinse the spray out of his eyes. As they walked back to the patrol car, Vinesky headed to the front of the car to fill out the complaint forms on the hood. Jackson moved Wright around the back of the patrol car.

At this point, the events of the night in question become far less clear. Only the severe injuries Wright suffered that night remain beyond debate. After his encounter with the officers in the parking deck, Wright had the following injuries: (1) multiple trauma including facial abrasions; (2) interhemispheric hemorrhage; (3) right frontal lobe contusion; (4) left optic canal fracture with left eye blindness; (5) left orbit fracture; (6) bilateral sphenoid wing fractures; (7) right temporal skull fracture; (8) left frontal sinus and base of skull fracture; (9) left maxillary sinus fracture; (10) nasal fracture; (11) left frontal subdural hematoma; (12) chest contusion; and (13) contusions to the right arm, left scapula, and left clavicle area.

Wright's treating neurosurgeon testifies that all these injuries occurred while Wright was in the officers' custody.[1] The neurosurgeon's opinion is supported by ev-

1. Dr. Tabet testifies that only the right frontal lobe contusion could have arguably occurred earlier: "The only one of those that I discussed which is questionable and arguable, I think, is the right frontal lobe contusion. I think most people would tell you it is probably acute."
(Tabet Dep. at 24–25.)

idence that Wright had not been injured before he came into police custody.[2]

Jackson testifies that Wright suffered these injuries after he resisted being cuffed and placed back into the patrol car. Wright allegedly resisted by kicking to his rear, where Jackson had positioned himself. After this alleged resistance, Jackson employed knee strikes, a defensive tactic involving blows to the thigh. Although somewhat unclear, Jackson says these strikes had some effect on Wright.[3]

After suffering a kick to the groin area, Jackson says he employed a defensive tactic known as the "straight-arm bar takedown." This maneuver brings a suspect to the ground, face down, to allow handcuffing. Officer Jackson says he applied this maneuver and took Wright to the ground. He says Wright came face first to the concrete floor. Vineksy, who says she could not see the struggle on account of the open patrol car door, heard Wright hit the floor. Walking toward the back of the car, she saw Wright laying face down in a pool of his own blood. She called the Canton Emergency Medical Service for an ambulance.

The EMS crew brought Wright to Aultman Hospital in Canton. Dr. Ginger Hamrick examined Wright in the emergency room. She says she spoke with both Jackson and Vinesky about the nature of Wright's injuries. She testifies that Vineksy first told her that Wright had merely fallen while not handcuffed.[4] Suspecting this was not possible because Wright had no injury to his hands, Dr. Hamrick returned to Vinesky and Jackson.[5] Dr. Hamrick says that Vinesky

---

**2.** Canton Police Captain Myers testified that witnesses who had seen Wright shortly before he was arrested said "he did not appear to have any injuries on any of the skin area" that could be seen.

(Myers Dep. at 31.)

**3.** Defendant Jackson testifies that he used the knee strikes to buckle Wright's legs:

A. Okay. Prior to that, as he started kicking around, I delivered what's called several knee strikes which is delivered to the common peroneal area right in this vicinity here (indicating).

Q. Now, when Mr. Ward went onto the ground, it looked like his knees went down first and then his body. Is that the way it happened with Mr. Wright?

A. I, sir, I reacted how I'm trained and it happened very quickly.

Q. But would it be fair to say that the first thing you did is the knee strike—first thing you did was the knee strike which would have buckled his leg?

A. Yes, sir.

Q. Okay. And then you would take—the takedown maneuver. And the reason for that is it's easier to get him down?

A. Well, it creates what's called a stunning effect in the knee, the common peroneal area.

(Jackson Dep. 22–23.)

**4.** Dr. Hamrick testifies that Vinesky first told her that Wright fell with his hands free:

A. I walked back and I asked what—asked them to describe to me what had happened. Their *initial response coming from the female officer initially was that he had fallen down,* and I asked if he was cuffed when he fell down, because he had obviously not protected his face at all, and *her initial response was no, he did not have handcuffs on.*

(Hamrick Dep. at 46).

**5.** Dr. Hamrick testifies that Vineksy changed her story:

A. So I went back and re-examined this patient again looking, because if you're—if you're not cuffed, if you're able to protect yourself, when you fall forward your hands go out. Even if you're semiconscious your hands go out because the force of your arms pull you forward. He had no signs of injuries that he had protected himself during the fall. So back to them for *the second time and said I have some concerns here because his injuries don't indicate that he was uncuffed,* at which point I believe she said again that oh, yes, he was cuffed and he fell down.

(*Id.*)

changed her story and told Dr. Hamrick that Wright had fallen while handcuffed. Dr. Hamrick says Vinesky and Jackson eventually told her that Wright was injured as a result of a defensive takedown maneuver.

Suspicious of this explanation, Dr. Hamrick had an emergency room nurse contact the Canton Police Department. Lieutenant Anthony DeMeo, the supervising officer on duty that night, soon arrived in the emergency room. DeMeo and Dr. Hamrick discussed the nature of Wright's injuries.

The content of this conversation remains in dispute. In his report, DeMeo says Dr. Hamrick expressed concern that Wright's injuries could not have occurred from a mere fall. She allegedly told DeMeo that Wright's injuries were caused by hitting a hard object with considerable force. DeMeo further says Dr. Hamrick told him that she found no evidence that Wright was struck by any object other than the cement floor.

Dr. Hamrick remembers this conversation differently. She says she told DeMeo that her concern arose from the three different stories given to her by Vinesky and Jackson. She further testifies that she informed DeMeo that Wright's severe injuries were not consistent with the officers' stories. Dr. Hamrick denies ever offering DeMeo any suggestion of what type of object caused Wright's injuries.

At around 8:00 a.m. on November 3, 1999, the internal affairs division of the Canton Police Department received notice of the incident involving Wright. Captain John Myers opened an investigation that morning. Myers continued his investigation for a little more than one month, during which time he spoke with Jackson, Vinesky, Wright, the Dairy Mart clerk, a barmaid at the bar where Wright had been drinking the evening of the incident, and the two paramedics who treated Wright at the scene. Myers did not speak to Dr. Hamrick as part of his investigation.

On December 9, 1999, Myers issued his final report on the Wright incident. He gave the opinion that Officers Jackson and Vinesky had not subjected Wright to excessive force. He based this conclusion on the fact that Jackson had not used lethal force to subdue Wright, but instead employed a "minimal force" maneuver taught in the police academy.

Wright disagrees with Myers's conclusion. He insists Jackson and Vinesky used excessive force upon him in the parking deck. Further, Wright says that by failing to investigate and discipline Jackson and Vinesky's alleged use of excessive force, Defendant City of Canton ratified his constitutional deprivation.

Accordingly, Wright filed this action on October 26, 2000. He sues Defendants under 42 U.S.C. § 1983, alleging violations of his Fourth and Fourteenth Amendment rights. He also asserts state law claims against Vineksy and Jackson for assault and battery and intentional infliction of emotional distress.

Defendants now seek summary judgment on Wright's claims. Vinesky and Jackson say they are immune from liability on both the § 1983 and state law claims asserted against them. The City insists Wright has not offered sufficient evidence to support his municipal liability claim under § 1983.

The Court considers Defendants' motions below.

II

A court may grant summary judgment only if the materials properly before the court "show that there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the burden of showing conclusively that no genuine issue of material fact exists. *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435 (6th Cir.1987). In deciding whether the moving party has met this burden, a court views the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The factual dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. 2505. The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial. *60 Ivy Street,* 822 F.2d at 1435 (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Thus, the judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue a proper jury question. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *60 Ivy Street,* 822 F.2d at 1436 (quoting *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505). Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505.

## III

### A

Plaintiff Wright first sues Defendants Jackson and Vineksy under 42 U.S.C. § 1983. This statute provides recovery for constitutional deprivations suffered under the color of state law. 42 U.S.C. § 1983 (stating that every person who, under color of state law, causes "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .").

■ Jackson and Vinesky seek summary judgment on Wright's § 1983 claim. They raise the doctrine of qualified immunity as a defense to liability.

■ The doctrine of qualified immunity shields state actors from liability based on their discretionary acts. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages"). In so doing, the doctrine gives state actors the freedom to perform their official duties without fear that even a slight misstep will trigger their financial ruin. *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992)

("Accordingly, we have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.").

■ But state actors lose this immunity when they violate clearly established constitutional rights of which a reasonable person should have known. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727 (holding that qualified immunity shields state actors only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."). The doctrine thus offers no solace to "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

The United States Court of Appeals for the Sixth Circuit has set forth a three-step process for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir.1999) (en banc) (quotations omitted) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Dickerson v. McClellan*, 101 F.3d 1151, 1157–58 (6th Cir.1996).

Thus, in analyzing Wright's § 1983 claim, the Court looks first to whether Wright offers sufficient evidence of a constitutional violation. Wright says Jackson and Vinesky violated the Fourth Amendment by subjecting him to excessive force. Wright offers sufficient evidence of such a violation.

■ The Fourth Amendment's prohibition of unreasonable seizures limits the amount of force police officers may use during an arrest. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Specifically, officers may use only the degree of force necessary to effect an arrest. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997).

■■ In assessing a particular use of force, the Court will not second-guess an officer's judgment from the comfort of chambers. Rather, the Court asks whether a reasonable officer on the scene would have employed a similar degree of force. *Smith v. Freland*, 954 F.2d 343, 345–47 (6th Cir.1992); *Monday*, 118 F.3d at 1104. In so doing, the Court remains mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

Nevertheless, the Court finds the evidence in this case supports Wright's claim of excessive force. Wright suffered massive injuries while in Jackson and Vinesky's custody. Although the officers say the injuries resulted from a single fall after a simple takedown maneuver, Wright offers evidence suggesting otherwise.[6]

---

**6.** Arguing otherwise, Jackson and Vinesky rely on this Court's holding in *Butler v. Coits-* *ville Township*, 93 F.Supp.2d 862 (N.D.Ohio 2000).. However, the evidence in this case is

Most notably, Dr. Hamrick testifies that Wright's injuries are not consistent with a single application of force. Dr. Hamrick observed injuries to both right and left sides of Wright's head. And on Wright's neck, she saw marks indicative of choking. Based on these observations, Dr. Hamrick concluded, to a reasonable degree of medical certainty, that Wright's injuries were caused "by multiple trauma not consistent with what was told to me by the officers."

■ Jackson and Vinesky seek to exclude Dr. Hamrick's opinion. They argue that only a biomechanical engineer or a forensic scientist can determine whether Wright's injuries are consistent with a single fall.

The Court disagrees. Dr. Hamrick has worked as an emergency room physician at Aultman Hospital for nearly eight years. She testifies that she has extensive experience in treating patients with injuries from a variety of sources. This experience qualifies Dr. Hamrick to offer an opinion as to whether Wright's injuries are consistent with the takedown described by the officers. Fed.R.Evid. 702. Jackson and Vinesky's arguments regarding the limitations of Hamrick's expertise go to the weight of her testimony, not its admissibility.

Beyond Dr. Hamrick's testimony, Wright offers the opinion of Dr. Jean Claude Tabet, the neurosurgeon who treat-ed Wright. Dr. Tabet opines that Wright's injuries were caused by multiple applications of force. When asked where Wright's blunt trauma originated, Dr. Tabet responded, "Based on the injuries that he sustained, I would suspect that it was in more than one place on more than one side." (Tabet Dep. at 27.) He later says Wright's facial injuries suggest Wright received "multiple blows to the face." (*Id.* at 53.) And Dr. Tabet explained that Wright's massive injuries do not typically result from a single takedown:

Q. And I'm describing it that way for you, to assume that to be true, that this was a very violent takedown, where he goes down like this, striking his head with all his weight

A. The experience that I have with patients that have had that kind of thing, whether they are assaulted or they are resisting arrest or have been brought in by the police, typically don't have these number and extent of injuries that we see with typically one fall.

Q. I want you to understand, this isn't a fall.

A. Or a takedown.

(*Id.* at 31.)

Lieutenant DeMeo gives testimony that supports Dr. Hamrick and Dr. Tabet's opinions regarding the cause of Wright's injuries. Specifically, DeMeo testifies that he has never heard of anyone suffering in

---

substantially more probative of excessive force than that offered in *Butler*.

In *Butler*, the plaintiff brought suit on behalf of a decedent who died of head injuries after falling in his jail cell. Offering evidence that the decedent's head injuries were more severe than those expected from his fall, the plaintiff claimed that the officers who arrested the decedent seventeen hours before his death had used excessive force in effecting his arrest.

This Court granted summary judgment to the defendant officers. The plaintiff had not offered any evidence showing the arresting officers used any force whatsoever to effect the decedent's arrest. Indeed, the decedent himself said before his death that he had not been assaulted. *Id.* at 866.

In contrast, the parties in this case do not dispute that force was used to restrain Wright. The only question is whether the degree of force employed was excessive. As explained in the text, Wright offers sufficient evidence to convince a reasonable juror that he was subjected to excessive force.

an injury as a result of a straight-arm bar takedown.

Moreover, Wright offers evidence that Jackson and Vinesky repeatedly changed their account of what transpired. Dr. Hamrick says Vinesky first said that Wright fell while not in handcuffs. But when Dr. Hamrick explained to Vinesky that Wright's hands did not show any signs of breaking his fall, Vinesky allegedly changed her story and explained that Wright was handcuffed when he fell. Dr. Hamrick then went over the severe nature of Wright's head injuries, as revealed in his CAT scan. Once aware of these injuries, Vinesky and Jackson allegedly told Dr. Hamrick that Jackson brought Wright to the ground with a defensive maneuver.[7]

■ However, even if this evidence suggests Wright suffered excessive force, Vinesky says Wright offers no evidence that she ever assaulted him. Indeed, both Jackson and Vinesky testify that only Jackson made physical contact with Wright in the parking deck. But this does not mean Vinesky cannot incur § 1983 liability. A police officer cannot sit idly by while a fellow officer subjects an individual to excessive force. *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982) (holding that "it is not necessary, to hold a police officer liable under s 1983, to demonstrate that the officer actively participated in striking a plaintiff"); *Byrd v. Brishke,* 466 F.2d 6, 11 (7th Cir.1972) ("We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop others who summarily punish a third person in his presence or otherwise within

his knowledge."); *see also Durham v. Nu'man,* 97 F.3d 862, 866–68 (6th Cir. 1996) (applying duty to intervene to state hospital nurse and security officer); *McHenry v. Chadwick,* 896 F.2d 184, 188 (6th Cir.1990) (applying duty to intervene to corrections officers). For purposes of § 1983, the failure to intervene in such a situation is tantamount to the direct application of excessive force.

■ Having found sufficient evidence of a constitutional violation, the Court next considers whether this alleged violation involved clearly established constitutional rights of which a reasonable person would have known. The parties do not dispute that the right to be free from unreasonable seizures is clearly established. *Watkins v. City of Southfield,* 221 F.3d 883, 887 (6th Cir.2000). Any reasonable officer should know that he can employ only the degree of force reasonably necessary to effect a seizure. Further, a police officer's obligation to prevent a fellow officer from using excessive force is also clearly established. *Bruner,* 684 F.2d at 426; *see also Durham,* 97 F.3d at 866–68.

Thus, the critical question is whether any reasonable officer in Jackson and Vinesky's position would know that they violated Wright's constitutional rights. Of course, at the summary judgment stage, the exact nature of the officers' conduct remains in doubt. Thus, drawing all inferences in favor of the nonmoving party, the Court looks only to whether Wright has alleged " 'sufficient facts supported by sufficient evidence' " showing the officers acted in an objectively unreasonable manner.

---

7. However, it is not certain whether Vineksy and Jackson had a motivation to deceive Dr. Hamrick. Jackson and Vinesky offer evidence that, before talking to Dr. Hamrick, they told their supervising officer and the paramedics that Wright was injured as a result of a takedown. Crediting this evidence, the jury may conclude that the changing stories Jackson and Vinesky allegedly offered to Dr. Hamrick were innocent in origin. The jury will ultimately make this determination.

*Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996) (quoting *Adams v. Metiva,* 31 F.3d 375, 387 (6th Cir.1994)).

Wright has done so. As set forth above, Wright offers support for his allegation that he suffered a massive, unwarranted beating while in Jackson and Vinesky's custody. No reasonable officer would believe he could inflict such a beating, or allow a fellow officer to do so, without violating the Fourth Amendment.

Thus, Wright offers sufficient evidence to defeat the officers' assertion of qualified immunity. Accordingly, the Court denies Jackson and Vinesky's motion for summary judgment on Wright's § 1983 claim.

B

█ Wright also sues Defendant City of Canton under 42 U.S.C. § 1983. This claim requires the Court to delve into the sometimes murky jurisprudence of municipal liability under § 1983.

█ A municipality is subject to suit under § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a municipality does not incur § 1983 liability based solely on the unconstitutional acts of its employees. That is, a municipality cannot be held liable on a theory of respondeat superior. *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Monell,* 436 U.S. at 694–95, 98 S.Ct. 2018. Rather, a plaintiff must show that the municipality's own policies or customs proximately caused the constitutional violation:

[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the

government entity is responsible under § 1983.

*Monell,* 436 U.S. at 694, 98 S.Ct. 2018.

█ In most cases, a municipal policy does not facially violate the Constitution. This leaves the plaintiff with the difficult task of showing a constitutionally-valid policy nevertheless caused a constitutional violation. And the plaintiff's burden is compounded by having to establish the municipality's fault. *Board of County Comm'r v. Brown,* 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.") (citing *City of Canton,* 489 U.S. at 391–92, 109 S.Ct. 1197). Specifically, the plaintiff must show the municipal policy at issue evinces "deliberate indifference" to constitutional rights. *Id.* at 406, 109 S.Ct. 1197 (quoting *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197).

█ However, on occasion, a municipal policy facially violates the Constitution. In such a case, the plaintiff's task in establishing a § 1983 claim is less cumbersome. *Id.* at 404—05, 109 S.Ct. 1197 ("Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."). In particular, the plaintiff need not establish the municipality's deliberate indifference. *Id.*

█ A municipal policy may facially violate constitutional rights in three ways. First, the policy may itself deprive a person of his constitutional rights. *Owen v. Independence,* 445 U.S. 622, 627–29, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (finding

municipal liability based on city council's censure and discharge of employee without due process). Second, a policy may direct a municipal employee to violate the Constitution. *Pembaur v. Cincinnati*, 475 U.S. 469, 485, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (finding municipal liability when final policymaker directed deputies to forcibly enter physician's office in violation of Fourth Amendment). Finally, a policy may ratify a municipal employee's unconstitutional acts. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because the decision is final.").

Here, Wright bases his municipal liability claim on a theory of ratification. He says the City ratified Jackson and Vinesky's alleged use of excessive force by failing to meaningfully investigate their conduct.

The United States Court of Appeals for the Sixth Circuit has twice found that a municipality ratifies its employees' unconstitutional acts by failing to meaningfully investigate those acts. *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1989); *Marchese v. Lucas*, 758 F.2d 181 (6th Cir.1985). Both cases involve facts remarkably similar to those alleged in this case.

In *Marchese*, a county sheriff failed to investigate his deputies' beating of an inmate who earlier threatened a deputy's life. The court found that the sheriff's failure to investigate constituted ratification of his deputies' unconstitutional acts. And because the sheriff acted as the county's final policymaker with regard to law enforcement matters, the court considered this ratification as municipal policy for purposes of § 1983. *Marchese*, 758 F.2d at 188.

Likewise, in *Leach*, a county sheriff did not investigate his employees' failure to provide for the medical needs of a paraplegic inmate. The court relied on *Marchese* and imposed liability on the municipality:

> Thus, like *Marchese*, the Sheriff here ratified the unconstitutional acts. In *Marchese*, such ratification was deemed sufficient to attach liability to the sheriff and the County. We find equally sufficient in this context.

*Leach*, 891 F.2d at 1248.

Based on *Marchese* and *Leach*, Wright can establish his municipal liability claim by showing (1) a final municipal policymaker approved an investigation into Jackson and Vinesky's conduct (2) that was so inadequate as to constitute a ratification of their alleged use of excessive force. Wright offers sufficient evidence to make this showing.

The parties do not dispute that Canton Police Chief Thomas Wyatt approved the internal affairs investigation into the incident that led to Wright's injuries. Under Ohio Revised Code § 737.12, the chief of police is the final policymaker with regard to investigations that do not result in disciplinary action. Because the investigation into Jackson and Vinesky's conduct did not result in their discipline, Wyatt's approval of the investigation constitutes municipal policy.

And a reasonable juror could conclude Wyatt's approval of the investigation meant that he ratified Jackson and Vinesky's alleged use of excessive force. Specifically, Wright offers evidence showing the investigation was not designed to discover what actually happened to Wright while in Jackson and Vinesky's custody.

Most notably, Captain Myers never interviewed Dr. Hamrick as part of his internal affairs investigation. Myers never discussed Wright's injuries with Dr. Hamrick.

Nor did he inquire as to Jackson and Vinesky's behavior the night of the incident. Thus, Myers concluded his investigation without knowing that Dr. Hamrick (1) insists Jackson and Vinesky gave three different stories as to how Wright suffered his injuries and (2) believes Wright was not injured as a result of a single take-down.

Wright has offered enough evidence to sustain his municipal liability claim under § 1983. The Court therefore denies the City's motion for summary judgment.

## C

█ Finally, Wright asserts various state law claims against Defendant Officers Jackson and Vinesky. Raising immunity as a defense, Jackson and Vinesky seek judgment on these claims.

█ Ohio Revised Code § 2744.03(A)(6)(b) provides limited immunity to political subdivision employees. When engaged in governmental functions, such employees are immune from tort liability unless they act "with malicious purpose, in bad faith, or in a wanton or reckless manner, . . ." § 2744.03(A)(6)(b).[8]

Jackson and Vinesky say they did not act in such an egregious manner so as to lose their immunity under Ohio law. However, the truth of this assertion remains to be seen. Wright suffered severe injuries while in the officers' custody. He also offers evidence that the officers gave changing accounts of how Wright suffered these injuries. And evidence suggests the account the officers have put forth in this case is inconsistent with the nature of Wright's massive injuries. Considered in the cumulative, this evidence supports a finding that Jackson and Vinesky subjected Wright to far more force than necessary to bring him under control. A reasonable jury could very well find such conduct reckless, if not malicious.

For this reason, the Court denies Jackson and Vinesky's motion for summary judgment on Wright's state law claims.

## IV

The Court finds genuine issue of material facts related to each of Plaintiff Wright's claims. Accordingly, the Court denies Defendants' motions for summary judgment.

IT IS SO ORDERED.

---

**8.** "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 90, 658 N.E.2d 814, 821 (1995); *Piro v. Franklin Twp.*, 102 Ohio App.3d 130, 139, 656 N.E.2d 1035, 1041 (1995). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Cook*, 103 Ohio App.3d at 90–91, 658 N.E.2d at 821; *Piro*, 102 Ohio App.3d at 139, 656 N.E.2d at 1041. "Wanton" misconduct refers to one's failure to exercise any care whatsoever. *Fabrey v. McDonald Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (1994); *Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977) (syllabus). "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Thompson v. McNeill*, 53 Ohio St.3d 102, 104–05, 559 N.E.2d 705, 708 (1990) (quoting Restatement (Second) of Torts § 500 (1965)).