**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0496n.06

**No. 16-3754**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JIM DAVID, JR., Administrator of the Estate of Deceased James David, Sr., | ) ) ) | **FILED**<br>Aug 24, 2017<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) |  |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| CITY OF BELLEVUE, OHIO; SERGEANT JEFFREY MATTER, City of Bellevue; PATROLMAN ERIK LAWSON, City of Bellevue, | ) ) ) |  |
| Defendants-Appellees. | ) ) |  |

BEFORE:    BOGGS, BATCHELDER, and WHITE, Circuit Judges.

BOGGS, Circuit Judge.   The Estate of Jim David brings this appeal from a grant of summary judgment below to two officers and the City of Bellevue.  David was shot and killed when officers approached him at night while he sat on his porch in order to get his side of a complaint by a neighbor.  David was holding a gun, and the officers testified that he aimed it at an officer, leading to their opening fire.  The Estate put forth evidence and testimony that David never raised his gun and was shot without provoking the officers.  Because the Estate has made a showing of a genuine issue of material fact that David had not raised his gun and aimed it at an officer and therefore that David did not pose an imminent threat to the officers' safety, we reverse the district court's grant of summary judgment to the officers.

I

Just after 10 p.m. on September 22, 2010, the City of Bellevue Police Department received a 911 call reporting a dispute and a man brandishing a gun. Sergeant Jeffrey Matter and Patrolman Erik Lawson had just begun their shift and left to investigate and interview the caller at an apartment building on Greenwood Heights Boulevard, a road in Bellevue, Ohio. First Lawson, and later Matter, arrived at the apartment building of the caller, James Armstrong; neither used lights or sirens. Armstrong and several others were on Armstrong's back porch. Armstrong was known to the police as someone who had been an aggressor in a few criminal incidents in the past, and had had several interactions with the police for domestic issues and drugs. Lawson asked him about the situation. Armstrong responded with "[p]lenty of expletives, but that there was a guy with a gun and that [he and others] were being threatened." Armstrong elaborated that the man had been "eyeballing" them from the sidewalk across the street and had proceeded to pull out a pistol and cock the slide to chamber a round. Lawson inquired where the man had gone, and Armstrong pointed to a house visible through the backyards on a residential street that was sixty to one-hundred yards away from Armstrong's back porch. Lawson stated that he saw someone sitting on the porch of the home, asked Armstrong for a description, and was told it was "an older guy." Others at Armstrong's residence interjected occasionally in support of Armstrong's narrative. Lawson conveyed the story to Matter and the two decided to approach and speak to the man on the porch. Lawson did not ask Armstrong whether he and the "older guy" had encountered each other earlier in the evening. At his deposition, Lawson at first denied that Armstrong told him that he and several others had gone to the older guy's home earlier that night to confront him about "eyeballing" them, but when his recollection was refreshed with his police report, Lawson admitted that

Armstrong told him that he, Armstrong, had confronted the older guy at his home on Union Street and that it was when the older guy was at his home that he brandished the gun.

The officers walked through backyards of houses fronting Union Street, which runs perpendicular to Greenwood Heights Boulevard, to reach the man on the porch rather than walk on the streets. They then crossed Union Street to enter the man's lawn. The man's front yard had a large tree on one side and a smaller tree on the other side. They approached in the darkness with weapons drawn and flashlights on. The two were in grey or dark blue uniforms and did not have on their police hats. As they drew closer and walked on the lawn, Lawson and Matter split up to come toward the man from two different directions. Lawson testified that he began to introduce himself: "Good evening, sir. I'm Officer Lawson, Bellevue Police Department. I'm responding to—." (Matter testified that he could not hear what Lawson said, but he believed that he was introducing himself "by the cadence of his voice and kind of the tone.") At this, the man—James David, Sr.—rose and walked away from the officer toward his door. Just before David entered his home, Lawson called out to him. David turned around and moved along the porch in the direction of Lawson. The officers testified that they then saw David point a gun at Lawson as he walked. Lawson shouted, "Gun," and fired at David; Matter quickly followed suit. The officers fired a total of twenty-four rounds at David: Lawson fired his entire clip and Matter fired eight shots. David was struck at least fifteen times. But he never fired his weapon.

After the shooting, David was slumped next to a chair on the porch. Matter and Lawson confirmed that they were both unharmed, and then Matter radioed dispatch to report the shooting and call for an ambulance. Matter went up to the porch, moved David's gun away from him, and checked David for signs of life. But there were none. Suddenly, Karen David (David's wife)

emerged from the home—having been awakened by the officers shooting her husband—and Matter ordered her back inside. Matter then examined David's gun and reported that it had a round in its chamber and was loaded. The Ohio Bureau of Criminal Investigation and Identification (BCI) arrived and processed the scene. They investigated the incident and in October 2010 determined that the officers had responded with a lawful use of force. The City of Bellevue did not conduct its own investigation and did not discipline Lawson or Matter.

In September of 2012, Karen David brought suit on behalf of the estate of James David, Sr., against the City of Bellevue, its police department, Chief Dennis Brandal, Matter, and Lawson. After two months, Mrs. David filed a notice of voluntary dismissal and the case was dismissed without prejudice. In November 2013, Karen David filed a new complaint. The district court dismissed a number of claims, including all claims against the Bellevue Police Department and Chief Brandal. After amendment, the complaint alleged violations of David's Fourth and Fourteenth Amendment rights, wrongful death, and negligent infliction of emotional distress. The amended complaint also substituted Jim David, Jr., in place of Karen David, as the Administrator of the estate of James David, Sr. After defendants sought summary judgment, the district court granted it with regard to David's Fourth and Fourteenth Amendment claims on the basis of qualified immunity for the officers and held that the city had performed an adequate investigation. With regard to the officers, the district court held that there was no genuine issue of material fact that Lawson had given a warning and that a reasonable officer would have believed himself or his partner under immediate threat in Lawson and Matter's positions. The district court's ruling was timely appealed.

II

A.  Legal Framework

We review a district court's grant of summary judgment de novo.  *Phillips v. Roane County*, 534 F.3d 531, 538 (6th Cir. 2008).  Summary judgment should be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of material fact will exist when, assuming the truth of the nonmoving party's evidence and construing all inferences from the evidence in the light most favorable to the nonmoving party, there is sufficient evidence for a trier of fact to find for that party.  *Gradisher v. City of Akron*, 794 F.3d 574, 582 (6th Cir. 2015).

The essence of a claim under 42 U.S.C. § 1983 is a deprivation of a federal right by someone acting under color of law.  *See Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).  Government officials acting in a discretionary capacity are entitled to qualified immunity where "their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  A city can be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" of a constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  In order to demonstrate an illegal policy or custom, a plaintiff must show "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

"It is undisputed that the right at issue in this case—the right against unreasonable deadly force—is a clearly established constitutional right." *Margeson v. White County*, 579 F. App'x 466, 471 (6th Cir. 2014) (citing *Pearson v. Callahan,* 555 U.S. 223 (2009)).  Force that is "'objectively [un]reasonable' in light of the facts and circumstances confronting" officers violates a federal right.  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  We examine "reasonableness at the moment," and not "with the 20/20 vision of hindsight." *Id.* at 396.  And we include in our consideration "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Hayden v. Green*, 640 F.3d 150, 153 (6th Cir. 2011) (quoting *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006)).

## B.  Lawson and Matter

The four main questions to be addressed are (1) whether a sufficient warning was provided (as the district court held); (2) if not, whether a warning was necessary; (3) whether there exists a genuine dispute that David did not pose an imminent threat to the officers; and (4) whether a genuine dispute exists that the officers continued firing after David was incapacitated.  We address each question in turn.

*1. Whether a warning and identification were provided.*  As the district court recognized, and Defendants acknowledge, a warning is necessary before the use of deadly force when such a warning is feasible.  *See Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985).  The district court found that there was no genuine issue of material fact whether a warning had been provided and so it did not need to reach the question whether a warning was required.  The district court noted that testimony from neighbors stating that they did not hear a warning and Matter's testimony that he was unable to understand what Lawson said were not enough to rebut Lawson's

testimony or create a genuine issue of fact. It cited *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009), to support the notion that witnesses' failure to hear a warning is insufficient to rebut testimony that a warning was given and thereby create an issue of fact. The district court's observations were correct. Much like in *Chappell*, the fact that Matter did not know the exact words that Lawson used in introducing himself may be due to the fact that he was "likely . . . paying attention to other matters," such as establishing whether David was armed. *Id.* at 914. The same is true of the neighbors, who were either not aware of the incident while it was occurring or were at a significant distance. The panel in *Chappell* held that any such factual question did not "actually raise a *genuine* dispute of fact" with regard to the existence of a warning. *Ibid.* It follows that here too, there is no genuine dispute of fact with regard to identification and warning. Unfortunately, because the best witness on David's behalf (David himself) cannot provide testimony in this case, our understanding of the encounter will be incomplete at best. But because the only relevant facts regarding the warning are from the testimony of the officers and Lawson's testimony indicates that a warning was given, summary judgment on the claim is appropriate. As a result, we need not reach the question whether any warning should have been given.

   *2. The threat posed by David.* The key fact at issue in this case is whether David had his gun pointed at the officers. If it was indeed the case that David had his gun pointed at the officers, then a reasonable officer would presumably be justified in shooting based on a belief of imminent harm. *See, e.g.*, *Garner*, 471 at 11. But if "there are facts which might indicate otherwise," such as testimony indicating that the position of the body showed that the gunman did not in fact have the gun raised, then a genuine issue of material fact may exist. *Brandenburg v. Cureton*, 882 F.2d 211, 215 (6th Cir. 1989). Here, the testimony is divided. Both Lawson and

Matter testified that David had his gun pointed directly at Lawson—Lawson described it as "proper shooting form." Yet Appellant's expert David Balash provided testimony that contradicted that account. Balash stated in his expert report that, given that there were no bullet strikes to David's forearms, hands, or the gun itself, "the pattern of bullet strikes to the body is not consistent with [the] suspect standing, facing out into the yard and pointing a weapon in the direction of one of the officers." He further noted that only two possible bullet strikes could be reasonably attributed to a standing David.[1]

In *Brandenburg*, this court held that where the question of fact was whether Brandenburg's gun was up or down when police shot him, expert testimony that indicated that his finger was not on the trigger and that questioned whether his arm was lifted to aim a rifle at officers was sufficient to defeat qualified immunity. 882 F.2d at 215. This case presents the same question. The expert acknowledges that two shots were fired while David was standing. The question, then, is whether expert testimony and facts that indicated that David did not have his arm raised with a weapon pointed at the officers are sufficient to defeat qualified immunity. As in *Brandenburg*, we hold that they are. The facts, taken in the light most favorable to David, show that it is a reasonable conclusion that David did not have his arm raised at Lawson. If that

---

[1] Balash observed that two strikes could have occurred while David was standing: one to his abdomen and another to his buttocks. Four other bullet strikes that could plausibly have occurred while David stood were disqualified by Balash because two of them would have had to hit while David had his back to officers (a fact that no one contended happened here) and another two would have required David to have been leaning forward significantly. Balash's report states that these last two bullet wounds "track dramatically downward from their entry points and can only mean that Mr. David was leaning forward towards the officers, bent at the waist with his upper body parallel to the porch floor, or he was in a down position and leaning towards the officers." Both of Appellant's experts (Balash and Michael Lyman) state that the police did not testify that David was bending or leaning forward: "There was no account by either officer of Mr. David bending forward."; "Lawson and Matter never reported . . . [or] described [David] as leaning forward at the time of the shooting." Lawson testified "[Q. S]how me how Mr. David was holding the weapon. A. Leaning forward." But it is unclear whether Lawson meant that David was leaning forward or that the gun was leaning forward. In any event, neither officer testified that David leaned over so far as to be "bent at the waist with his upper body parallel to the porch floor," which is what Balash indicated was the position required for a standing David to have received these wounds. Lawson testified that David had the gun at a ninety-degree angle from his torso, a position that cannot be described as "proper shooting form" if the shooter is bent at the waist parallel to the floor.

were the case, then the shooting would be unjustified. Accordingly, summary judgment is inappropriate.

This holding does not implicate merely Lawson, who first pulled the trigger, but also removes qualified immunity from Matter as well. It is of no import that Matter shot only after Lawson opened fire. What counts is whether Matter knew that David did not pose a threat. We have held that an officer's opening fire—even if he was unsure who shot first[2]—was sufficient to defeat qualified immunity if the victim was not a threat. *See Floyd v. City of Detroit*, 518 F.3d 398, 408 (6th Cir. 2008). If David's arm was by his side—as the facts construed in the best light for David would indicate—Matter's opening fire would also be unjustified and a constitutional violation.

*3. Whether officers continued firing after David was no longer a threat.* Appellant also argues that the officers continued firing at David after he was no longer a threat, and limiting themselves would have possibly preserved David's life. "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014). Appellant claims that the evidence demonstrates that only two bullets struck David while he was standing and the rest struck him while he was kneeling or slumped to the ground. This, Appellant contends, shows that the officers continued to shoot after the threat had ended. In support, Appellant cites *Margeson v. White County*, 579 F. App'x 466 (6th Cir. 2014), an unreported case where a panel held that officers who shot a man forty-three times, including at least twelve times while he was lying on the ground, were not entitled to qualified immunity. In this case, Lawson testified that he fired initially while David had the gun pointed at him, and then kept firing after David was struck when David swung his arm out toward Matter. But as

---

[2] Again, David never fired his weapon.

established above, at the summary-judgment stage, the facts suggest that David did not have his arm raised and gun pointed at Lawson. Given the testimony that demonstrates that most of the bullets hit David while he was slumped over or on the ground, there is a genuine issue of material fact as to whether officers continued firing once David was incapacitated.

Accordingly, the district court's grant of qualified immunity and summary judgment to Lawson and Matter was in error with respect to their shooting David. The case presents a sufficient, material factual dispute that is best resolved by a fact-finder.

## C.  City of Bellevue

Although we hold that the district court erred in granting summary judgment on the basis of the facts before it, we affirm its holding that the City of Bellevue is immune from suit. As noted by the district court, Bellevue used an independent investigation through the Ohio BCI to look into the circumstances of the case and provided a second review by Chief Brandal to determine whether the officers' response was justifiable. For there to be a claim based on inadequate investigation, as Appellant argues, there must be not only an inadequate investigation in this instance, but also (1) a clear and persistent pattern of violations; (2) notice or constructive notice thereof; (3) tacit approval of unconstitutional conduct so as to constitute deliberate indifference; and (4) a direct causal link to the constitutional deprivation. *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). Appellant has not demonstrated any such pattern. Appellant instead argues that the investigation should give rise to liability on the basis that it was conducted with "no interest in finding the officers at fault" so as to not be "designed to discover what actually took place." Appellant's Br. 30, 34. Absent evidence of a pattern of violations, there is no demonstration of causation to show that the allegedly inadequate investigation caused the constitutional violation in question here. Appellant cites *Wright v. City of Canton*, 138 F.

Supp. 2d 955 (N.D. Ohio 2001), to support his contention that an inadequate investigation can constitute outright ratification of an unconstitutional action and thereby subject a municipality to liability. But under Supreme Court precedent, plaintiffs must show that "'action *pursuant to official municipal policy*' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (emphasis added) (quoting *Monell*, 436 U.S. at 691). An action cannot be pursuant to something that has not yet occurred. Because there can be no causation, even with a constitutional violation by Lawson and Matter, the City of Bellevue is immune from suit in this instance.

III

Because we reverse the district court's dismissal of some of David's federal claims, we also reverse the district court's dismissal of David's state-law claims and remand to permit the district court the opportunity "to determine whether to exercise supplemental jurisdiction over these claims given the" now-revived federal claims. *Veneklase v. Bridgewater Condos, L.C.*, 670 F.3d 705, 717 (6th Cir. 2012).

For these reasons, we REVERSE the district court's grant of summary judgment below with regard to Officers Lawson and Matter's use of force against David and AFFIRM it with regard to the City of Bellevue and with regard to the warning given by Lawson and Matter.