**Jennifer OTERO, Plaintiff,**

v.

**David R. WOOD, et al., Defendants.**

**No. 2:02–CV–478.**

United States District Court,
S.D. Ohio,
Eastern Division.

May 7, 2004.

Charles Herman Bendig, III, Wilcox, Schlosser & Bendig Co., Columbus, OH, for Plaintiff.

Timothy Joseph Mangan, Columbus City Attorney's Office, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment[1] and on Plaintiff Jennifer Otero's Motion for Partial Summary Judgment. Defendants, the City of Columbus (the "City") and 26 individual members of the Columbus Division of Police (the "CDP"), seek summary judgment in their favor as to the

---

1. All Defendants join in this Motion: Lt. David R. Wood; Sgt. Daniel Zoretic; Sgt. Mathias; Officers White, Brintlinger, Rich, Singer, Moss, Lawrence, Aurentz, Scanlon, Dickerson, Ey, Coffman, Buchacevich, Petty, McDaniel, Reffitt, Miller, Porter, and Groom; Lt. Thomas Henterly; Lt. Steven Hope; Sgt. S. Brown; Cmdr. W.R. Mattei; Cmdr. S. Curmode; and the City of Columbus.

entirety of Plaintiff's claims. Plaintiff seeks summary judgment as to liability only. For the following reasons, Plaintiff's Motion is **DENIED** and Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## II. BACKGROUND

On the evening of April 29, 2001, during the course of an alleged public disturbance in the vicinity of The Ohio State University ("OSU"), Plaintiff, Jennifer Otero, was apparently shot in the forehead with a wooden baton round fired out of a 37 millimeter riot gun.[2] At the time, Plaintiff and her friend Denisse Mbomyo were standing in a grassy area beside a sidewalk on Waldeck Avenue in Columbus. They were south of Norwich Avenue, approximately 42 feet from the intersection of Waldeck and Norwich Avenues, and were watching police formations in the intersection as the police were preparing to disperse the crowd of partygoers that had gathered at parties along Norwich Avenue.

The parties on Norwich Avenue had resulted in a complete blocking of the public street. The CDP had received reports of fights, rocks and bottles being thrown, and an attempt to flip over a car. Some officers were sent to the area but were unable to initiate enforcement action due to the size and volatility of the crowd. Meanwhile, a similar situation, fueled by excessive alcohol consumption, was developing a few streets south, on 13th Avenue. The CDP has extensive experience with riots and other disturbances near OSU. Excessive alcohol consumption of alcohol has been a common factor in most of these disturbances, and conduct has included de-struction of property, setting of fires, overturning of cars, and throwing of rocks, bottles, and other projectiles at police. On April 20 and 21, 2001, just one week prior to the incident at issue, there had been disturbances in the vicinity of Chittenden Avenue, northeast of campus.

On April 29, 2001, based on intelligence gathered about the likelihood of a disturbance, Commander Suzanne Curmode ensured that she would be present as on site incident commander to coordinate any police response to a potential disturbance. As the situation on Norwich Avenue deteriorated, Curmode made the decision to clear Norwich Avenue and disperse the crowd. From a staging area at a church lot on Norwich Avenue, two Special Weapons and Tactics ("SWAT") units, followed by the mounted unit and a field force of 40 to 50 officers, proceeded west on Norwich Avenue toward the crowd. According to police witnesses, the officers almost immediately met with resistance in the form of thrown rocks, bottles, and other items.

Curmode testified at deposition that warnings to disperse were given from the SWAT loudspeaker. Curmode also testified that she had been ordered by the Deputy Chief of the CDP to "discourage" the SWAT unit's use of tear gas (CS grenades). According to police witnesses, the police began deploying ordnance, including "less-lethal" munitions such as wooden baton rounds, only after being met with thrown projectiles. According to student witnesses, though there was some rowdy behavior, there was no aggressive behavior toward any of the police officers until after the police began to fire. In a police video

---

**2.** Defendants do not, at least for purposes of these Motions, dispute the fact that Otero was, in fact, struck in the forehead by a wooden baton round fired from a police operated gas gun. Indeed, Plaintiff's physical evidence on this point is convincing: expert tes-timony establishes that she was struck by a projectile of exactly the same size and shape as one of the wooden baton rounds, with none of the lacerations that one might expect had she been struck by a glass bottle.

taken of the north side of Norwich Avenue, the only audible warning is after the SWAT unit moves out, about 25 seconds before the first round is fired. The warning heard is, "Clear the area at this time; the party is over." On the video, 11 rounds may be heard being fired within 60 seconds of the warning. Mbomyo testified at deposition that, from where she and Otero were standing, she did not hear any warnings of any kind.

Mbomyo states that she saw police officers in black uniforms (i.e., SWAT officers) in the intersection of Norwich and Waldeck Avenues when she heard two shots, then saw Otero fall to the ground. There were four gas guns (two for each of the two SWAT units) being operated by four separate officers that night. The officer who was responsible for the sector of fire where Otero was standing was Officer W.J. Brintlinger.[3] The officer directly responsible for supervising Brintlinger was Sgt. Daniel E. Zoretic. Zoretic was inside a formation of seven other SWAT officers, where he had direct and personal control and supervision over the firing of gas gun projectiles by both gasmen in his unit—Officers Brintlinger and Rich. Zoretic admits that he could and did see the rounds fired by both officers. Directly behind the eight person formation, Lt. David Wood was providing supervision over all four gasmen. Curmode was providing general supervision from the south side of Norwich, the side of the street Plaintiff and her friend were standing on.

The wooden baton rounds fired from the four gas guns are known as "knee knockers." Each time they are fired, the gas guns discharge a group of five projectiles simultaneously. According to the manufacturer's specifications, the knee knockers have a muzzle velocity of approximately 280 feet per second (190 miles per hour). They are designed to be "skip fired," or fired at the ground, rather than fired directly toward targets. When properly skip fired, the rounds tumble, and never rise above waist level. Brintlinger, at deposition, confirmed that when firing knee knocker rounds at the test range, the rounds travel underneath the paper targets—i.e., they stay below three feet above ground level. Plaintiff is five feet, three inches tall and at the time of her injury was standing in a grassy area seven inches above the street. All police witnesses, however, deny either direct firing knee knockers or seeing anyone else do so on the evening of April 29.

As demonstrated by a CDP test, wooden baton rounds skip fired off of concrete or a similar hard surface display a distinctive scuffing pattern. Even rounds fired off of dirt or grass generally display scuffing or chipping from the force of the impact with the ground. After Otero was shot, one of her friends picked up a knee knocker round lying in the vicinity of where she had fallen. This round displays no scuffing, splitting, or any other indication that it struck any solid surface before striking Plaintiff. The City's expert concedes that this particular round was not skip fired off of concrete. Furthermore, both a medical expert, David Powell, M.D., and a law enforcement expert, Louis Mayo, Ph.D., retained by Plaintiff opine, to a reasonable degree of certainty, that Plaintiff's injury was the result of a wooden baton round that struck Plaintiff in a trajectory fashion. Plaintiff points to various testimony to establish that direct firing a baton round at her on April 29, 2001, would constitute an unreasonable use of force.

---

**3.** Brintlinger admits that the other gasman in his unit, Officer Rich, never fired at any house on the south side of Norwich Avenue on the unit's first pass.

After Otero was shot, she fell to the ground, unconscious. Mbomyo sought help from a passing SWAT officer who refused to provide any assistance. Two other friends arrived to help Plaintiff. One of them, Edwin Salazar, requested assistance from a group of mounted officers and from a group of officers in a paddy wagon. The mounted officers, using profanity, told Salazar he and his friends should not have been there. The officers in the paddy wagon told him, "You shouldn't have been here, you shouldn't have been here, it's your guys' fault." No officers provided any assistance; all Defendants deny having seen Otero lying on the ground or Mbomyo screaming for help. Eventually, Otero's friends carried her a few blocks away to another friend's house, where they got a car to drive her to the hospital.

As a result of the incident, Plaintiff received a depressed frontal sinus fracture. She has had to undergo reconstructive surgery. She suffered some brain damage, she lost her scholarship and is no longer able to function as a student at OSU, and she suffers from severe headaches. After Plaintiff recovered from the immediate medical effects of her injury, she and her father attempted to file a complaint with the CDP. The officer to whom they complained, Officer B.A. Bernhardt, merely filled out a "miscellaneous incident report" in which he included language favorable to the police. The police investigation was closed without any officer having been disciplined in any way.

On April 12, 2002, Plaintiff filed suit against the City and 26 named members of the CDP in the Franklin County Court of Common Pleas. The case was removed to this Court on May 17, 2002. In the Complaint, Plaintiff seeks compensatory damages, punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and the common law of assault and battery.

On September 30, 2003, Defendants filed a Motion for Summary Judgment. Plaintiff, in her Memorandum Contra Defendants' Motion, asks only that Defendants' Motion be overruled as to Defendants Brintlinger, Zoretic, Wood, Curmode, and the City. Also on September 30, 2003, Plaintiff filed a Motion for Summary Judgment on Liability as to Defendants Brintlinger, Rich, Zoretic, Wood, Curmode, and the City. This Motion is based on the doctrine of spoliation of evidence. Specifically, Plaintiff alleges that the police video taken of the south side of Norwich Avenue, a video that would have provided valuable footage of her being shot, was destroyed and that she therefore is entitled to summary judgment. This matter is before the Court on these two Motions for Summary Judgment.

### III. STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991). Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

■ The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the non-moving party. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

## IV. ANALYSIS

### A. Plaintiff's Motion

■ Plaintiff seeks summary judgment on liability as to Defendants Brintlinger, Rich, Zoretic, Wood, Curmode, and the City based on the doctrine of spoliation of evidence. In her Memorandum in Support of Summary Judgment, Plaintiff provides the following facts to support her Motion. On the night of April 29, 2001, one officer was ordered to videotape the north side of Norwich Avenue, and one officer was ordered to videotape the south side of the street. The north side video survives, and dramatic evidence from that video was the basis for the City paying $900,000 to Alicia Harvey (formerly Alicia Davis), who was blinded in one eye after having been shot with rubber sting ball rounds on April 29, 2001. Officer Sharon Liebrecht, who was ordered to film the south side of Norwich Avenue, had never received any training in how to operate the video camera. When she was given the camera that night, she had her sergeant check to make sure it was recording properly. She then recorded the events on the south side of Norwich Avenue. She was standing beside Curmode, right next to the SWAT unit when it fired the first knee knocker rounds on the south side of the street. The officer who filmed the events on the north side of Norwich Avenue delivered both the camera and the video to a mobile substation. Liebrecht, on the other hand, gave her video to Sergeant Timothy McVey at the Emergency Operations Center. When Liebrecht arrived at work Monday morning following the Saturday night of the incident, the tape was blank. Neither the camcorder nor the tape was checked for any potential problems, and both were presumably subsequently used without incident.

Based on these facts, Plaintiff argues that she is entitled to summary judgment in her favor because the police destroyed critical evidence that would have proven her claims. Plaintiff contends that the

destruction of valuable evidence, regardless of whether it was purposely done, warrants a presumption that the evidence destroyed would be unfavorable to the party that destroyed it.

Defendants, in response, provide a somewhat different version of the relevant facts. Liebrecht was given the video camera, which she had never before used, only a short time before the police line began to move. It was dark and noisy, and bottles and other debris were being thrown at the police. Liebrecht pushed a button she thought was the record button. She could see through the viewfinder, but she cannot say whether the camera was recording. Just as the police line was getting ready to move, a bottle struck the top of the SWAT vehicle and shattered glass hit Liebrecht on the side of the face. As a result, she put her face shield all the way down and looked through her face shield as she continued to operate the video camera. Although Liebrecht was directly behind the SWAT unit as the police started out, she quickly fell behind. She was not with the SWAT unit when it reached Waldeck Avenue. At the end of the evening, Liebrecht delivered the video camera, with the tape still in it, to McVey. McVey also was given the second video camera, also with the tape still in it. McVey locked both cameras in his police vehicle, which was parked at the substation for the remainder of the weekend. On Monday morning, McVey retrieved the tapes. Upon viewing the tapes, he realized that Liebrecht's tape was blank.

Defendants provide several reasons for denying Plaintiff's Motion. They contend that summary judgment may not be granted based on unsubstantiated allegations either that the video would have shown someone direct firing wooden baton rounds at Plaintiff or that the video was destroyed. Defendants assert that there is

no evidence that the tape was ever made or that it depicted what Plaintiff claims it would have depicted. Even if these hurdles are overcome, Defendants state that any prejudice to Plaintiff does not warrant the extreme sanction of judgment in her favor.

In her Reply Memorandum, Plaintiff, as she is required to do on a motion for summary judgment, abandons any factual assertions that differ from the factual scenario presented by Defendants. She acknowledges that it is possible that the video was never made, stating only that Liebrecht's testimony that she operated the camcorder in excess of 30 minutes without realizing that it was not recording is not credible. Plaintiff maintains, however, that she is entitled to a favorable inference as to what the videotape would have shown—regardless of whether it was destroyed or never made—and, thus, to judgment in her favor.

■ The most fundamental reason for denying Plaintiff's Motion is that Plaintiff has not established that the evidence that was allegedly destroyed ever actually existed. Recognition of a remedy for the failure to create evidence, as Plaintiff seems to urge upon this Court, would be absurd. Mere speculation that Liebrecht might be lying and that the evidence might have existed and been destroyed simply is not enough to justify summary judgment in Plaintiff's favor. Plaintiff asks this Court to draw inferences upon inferences. Plaintiff would have this Court infer that Liebrecht is lying simply because she did not notice, under dark, chaotic circumstances and operating an unfamiliar machine, that she was not recording. Upon this inference, Plaintiff urges this Court to build further inferences—that this video would have provided the "smoking gun" to

prove her case,[4] that someone realized how harmful the video would be, and that someone somehow destroyed the tape. The Court refuses to take even a single step down this path. Indeed, Plaintiff's speculations do not suffice to warrant an inference or a presumption in her favor. Plaintiff seems to abandon her initial factual claim that Liebrecht checked with her sergeant to ensure that the camera was recording. Absent such a fact, the evidence is uncontroverted that no recording was ever made. Since no recording was ever made, it is unnecessary to remedy the destruction of that recording. And since the CDP was not required to make a recording, its failure to do so is not punishable.

Plaintiff's Motion for Summary Judgment on Liability is therefore **DENIED** on the basis of Plaintiff's failure to establish that the evidence in question ever existed.

## B. Defendants' Motion

As an initial matter, the Court **GRANTS** summary judgment as to Defendants Mathias, White, Rich, Singer, Moss, Lawrence, Aurentz, Scanlon, Dickerson, Ey, Coffman, Buchacevich, Petty, McDaniel, Reffitt, Miller, Porter, Groom, Henterly, Hope, Brown, and Mattei. Plaintiff has apparently abandoned her claims against these Defendants since she seeks to overrule Defendants' Summary Judgment Motion only as to Defendants Brintlinger, Zoretic, Wood, Curmode, and the City. Plaintiff confines her arguments to the latter group of Defendants and provides no basis on which this Court should deny summary judgment to the former group of Defendants.

### 1. Plaintiff's § 1983 Claims

Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. In order to recover damages under 42 U.S.C. § 1983, a plaintiff thus must show that (1) the defendants were acting under color of state law; and (2) the defendants' actions deprived her of a specific federal statutory or constitutional right. *See Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998). By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of established rights. *City of Okla. City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

#### a. Defendant Brintlinger

Plaintiff argues that Defendant Brintlinger may be held liable for her injuries because, due to the controlled fields of fire of the four gasmen operating at the time she was injured, it is possible to determine that he is the officer who shot her. According to Plaintiff, the physical evidence establishes that she was injured by a wooden baton round direct fired by a gas gun. Plaintiff asserts that direct firing of a knee knocker round from less than 50 feet (the distance between her and the

---

4. In addition to failing to prove that the video ever existed, Plaintiff fails to establish the relevance of the video in light of Liebrecht's uncontroverted testimony that she was not with the SWAT unit when it reached Waldeck Avenue. *See Cincinnati Ins. Co. v. Gen. Mo-*

*tors Corp.*, No. 94OT017, 1994 WL 590566, at *4 (Ohio App. Oct. 28, 1994) (stating that party seeking remedy under spoliation doctrine must first establish that the evidence is relevant).

SWAT formation at the time she was shot was approximately 42 feet) clearly constitutes excessive force violative of her constitutional rights.

The Court finds that Defendants' Motion for Summary Judgment should be denied as to Defendant Brintlinger's liability pursuant to 42 U.S.C. § 1983. Taking all evidence in the light most favorable to Plaintiff, a reasonable jury readily could find that Defendant Brintlinger unlawfully direct fired his gas gun at Plaintiff, causing her injury. It is uncontroverted that Brintlinger was acting under color of state law at the time of the alleged unlawful acts. The question, then, is whether, under the facts as presented by Plaintiff, Brintlinger's actions deprived Plaintiff of her Fourth Amendment[5] right to be free from excessive force pursuant to *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).[6]

Plaintiff has presented sufficient evidence to allow a jury to find that she was injured by a wooden baton round that was direct fired, rather than skip fired, from one of the 37 millimeter riot guns in use by police on the evening of April 29, 2001. Though Defendants seek to discredit Plaintiff's expert and some of his conclusions, Defendants' attack goes only to the weight of those conclusions rather than to their admissibility. Furthermore, Defen-

dants do not even address some of Plaintiff's most compelling evidence. Plaintiff has ample evidence to support her theory. Plaintiff, who is five feet, three inches tall and was standing on a seven inch curb, has evidence that she was struck in the forehead by a knee knocker round that, if properly skip fired, would not have gone more than three feet above street level. Both Plaintiff's expert, Louis Mayo, Ph.D., and her treating physician, David Powell, M.D., state to a reasonable degree of certainty that she was struck by a wooden baton round traveling in a trajectory fashion rather than tumbling, as would have been the case had it been skip fired. Though it is possible that the knee knocker bullet found by Plaintiff's friends near where she collapsed would not bear scuff marks had it been skip fired off of grass or dirt rather than concrete, it did not bear the distinctive scuff marks that would indicate that it had been skip fired off of concrete, and a reasonable jury could find that the lack of any scuffing or chipping indicates that the bullet was not skip fired at all.[7] Defendants point to the fact that, according to Plaintiff's friend Edwin Salazar, the wooden baton round he retrieved from the scene initially had green marks on it. According to Defendants, this evidence strongly suggests that the bullet was, in fact, skip fired off of the grass. The Court, however, finds equally persua-

---

5. Plaintiff has not made it clear under which portions of the Constitution and laws of the United States her claims arise. In her Complaint, she states that Defendants violated her rights under the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution. The Court will analyze her claims under the Fourth Amendment.

6. Though Defendant Brintlinger does not claim qualified immunity, the Court notes that he would not be so entitled because his actions, if they were as Plaintiff alleges, violated a clearly established right of which a reasonable officer would have known. *See*

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Christophel v. Kukulinsky*, 61 F.3d 479, 484 (6th Cir.1995). The same is true of Defendants Zoretic, Wood, and Curmode.

7. The fact that the bullet retrieved by Otero's friends was not necessarily the exact bullet that struck her is of little consequence. Since each fired round consisted of five bullets, logic suggests that none of the five bullets in the round that targeted Otero would bear scuff marks had the gas gun been direct fired at Otero.

sive the inference that the green marks arose from the wooden bullet coming to rest in the grass, and perhaps being pushed into the ground by Plaintiff, upon falling, or by her friends as they attempted to help her.

Plaintiff also has presented sufficient evidence to allow a reasonable jury to find that Defendant Brintlinger was the officer who caused her injury.[8] Brintlinger was responsible for the left flank of Tango 1. Tango 1 was the SWAT unit responsible for the south side of Norwich Avenue. The SWAT unit responsible for the north side of Norwich Avenue is unlikely to have fired southward, because it would have risked hitting police officers in the line of fire. While it is possible that Officer Rich, the other gasman in Tango 1, could have caused Plaintiff's injury, Rich's position, according to a police diagram, was central; he was responsible for firing in a generally forward direction. Brintlinger, on the other hand, was responsible for firing toward the left of Norwich Avenue, where Plaintiff was standing. Brintlinger acknowledges that Rich did not fire at any houses on the south side of Norwich Avenue on the unit's first pass, when Otero was injured.

Finally, Plaintiff has come forward with evidence from which a reasonable jury could find that the direct firing of wooden baton rounds was an excessive use of force not justified by the circumstances. Defendants, in fact, seem to concede that direct firing would have been an excessive use of force. Defendant Brintlinger, at his deposition, agreed that direct firing of knee knocker rounds is unreasonable unless deadly force is authorized. Moreover, Mayo, based on the muzzle velocity of the wooden baton round and the manufacturer's warning that the wooden baton round should not be direct fired except when a probability of serious injury or death is acceptable, states to a reasonable degree of probability that the direct firing of the wooden baton round at Plaintiff was not only an unreasonable use of force, but was an unreasonable use of deadly force.

Based on the foregoing, Defendant's Motion for Summary Judgment is **DENIED** as to Plaintiff's § 1983 claim against Defendant Brintlinger.

### b. Defendants Zoretic, Wood, and Curmode

■ Plaintiff contends that Defendants Zoretic, Wood, and Curmode should be liable to her based on their failure adequately to supervise Defendant Brintlinger and their failure to assure that Plaintiff's constitutional rights were not violated. Defendants argue that the claims against Defendants Zoretic, Wood, and Curmode are based solely on a theory of respondeat superior and thus are not cognizable under § 1983.

■ Section 1983 liability must be based on more than respondeat superior, or the right to control employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir.1982). A supervisory official's failure to supervise, control, or

---

8. Defendants argue that Plaintiff has not presented sufficient evidence to permit an inference that Defendant Brintlinger was the shooter. Plaintiff, however, has presented more than a scintilla of evidence to support her position. The mere fact that her evidence on this point is circumstantial rather than direct evidence is not determinative. *See, e.g., United States v. Farley*, 2 F.3d 645, 650 (6th Cir.1993) (noting that circumstantial evidence is entitled to the same weight as direct evidence). Taking all facts in the light most favorable to Plaintiff, a reasonable jury could conclude, based on uncontroverted evidence regarding the controlled fields of fire of the four gasmen, that Brintlinger was the shooter who injured Plaintiff.

train an offending individual is not actionable unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays,* 668 F.2d at 874.

Plaintiff argues that Zoretic, Wood, and Curmode failed adequately to supervise Brintlinger, even though Zoretic was directly behind Brintlinger and Rich, Wood was directly behind Zoretic, and Curmode was in the immediate vicinity of the SWAT unit during the operation. Plaintiff also contends that Curmode failed to assure her a reasonable warning. Moreover, Plaintiff notes that the refusal of several officers to provide medical assistance demonstrates that the three supervisors were not adequately controlling the officers under their supervision. Plaintiff also asserts that, while she was subject to an order to disperse, she was not subject to the use of force since she had done nothing wrong; therefore, the mere firing of the wooden baton rounds violated her constitutional rights. Plaintiff argues that such force was not authorized against the crowd as a whole since the crowd generally was complying with verbal orders to disperse.

More was at issue here than the mere right to control Brintlinger. Rather, the three supervisors were present at the scene, directly participated in the actions taken, and were directly responsible for any unconstitutional conduct. In *Hall v. Shipley,* 932 F.2d 1147 (6th Cir.1991), the plaintiff claimed that his constitutional rights were violated when he was forced to remain naked during a portion of a search of his apartment. One of the defendants, Officer Shipley, argued that he could not be held liable because he was not personally involved in the violation and was not

responsible for the conduct of the uniformed officers. The court disagreed:

"As a general rule, mere presence at the scene of the search, without a showing of direct responsibility for the action, will not subject an officer to liability." *Ghandi v. Police Depart. of the City of Detroit,* 747 F.2d 338, 352 (6th Cir.1984). Further, a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. *Poe v. Haydon,* 853 F.2d [418, 429 (6th Cir.1988)]. Shipley argues that he is not directly responsible for any illegal actions taken by the other officers in executing the search warrant because he simply searched the premises while the other officers remained with Hall. Rejecting Shipley's argument, the district court found that Shipley "not only was the prime mover in obtaining the warrant and in planning and initiating the search itself, but he participated in the search once inside the dwelling. Both in entering the apartment and in the manner of the search itself a direct causal connection exists between Officer Shipley's actions and the alleged constitutional violation as to the reasonableness of the search." Shipley's argument is not supported by the record. Shipley's involvement cannot be characterized as "mere presence" nor as "mere backup."

*Hall,* 932 F.2d at 1154.

The involvement of Zoretic, Wood, and Curmode likewise cannot be characterized as "mere presence" or "mere backup." Zoretic was virtually looking over Brintlinger's shoulder when Brintlinger fired the gas gun. Wood was directing the firing of the knee knockers in a hands-on and immediate way. Curmode was the "prime mover" of the entire operation, responsible

for planning and initiating all action. None of these Defendants was a remote, desk-bound supervisor; rather, all three were direct participants in the firing of the knee knockers on April 29, 2001. Similarly, taking all of Plaintiff's factual allegations as true, there is a direct causal connection between the supervision provided by Zoretic, Wood, and Curmode and the failure of any officers to provide medical assistance to Plaintiff. Indeed, Zoretic, Wood, and Curmode may all be said to have directly participated in this alleged constitutional violation since they were present in Plaintiff's immediate vicinity and they, too, failed to help and were arguably deliberately indifferent to her need.

The evidence presented by Plaintiff also reveals inadequate warnings. Mbomyo testified that she did not hear any warning before being fired upon. On the police video of the north side of Norwich Avenue, a warning may be heard, but firing begins only 25 seconds after the warning; several rounds are fired within 60 seconds of the warning. Plaintiff contends that adequate time to disperse was not provided after any warnings were given and before the firing of wooden baton rounds began. Plaintiff also notes that any warning given did not comply with CDP emergency orders, which state,

> [T]o remove demonstrators, the police incident commander will use a bullhorn to read a warning to demonstrators. The warning will be read two times and will be videotaped if possible. YOU ARE HINDERING THE MOVEMENT OF PERSONS (ENTERING) (EXITING) / (WITHIN) (UPON) / (PUBLIC) (PRIVATE) PROPERTY AND ARE, THEREFORE, IN VIOLATION OF SECTION 2319997.11(A)(4) OF THE COLUMBUS CITY CODE. IF YOU REFUSE TO LEAVE NOW YOU WILL BE ARRESTED.[9]

Furthermore, people present in the area were not warned that they had been declared to be part of a riot or that force would be used against them if they failed to disperse.

 A suspect has the right to a warning—absent exceptional circumstances that would render a warning impracticable—before police use deadly force. *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir.1998); *see Tennessee v. Garner*, 471 U.S. 1, 11–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Sixth Circuit considers two factors in determining whether the use of a particular law enforcement tool constitutes deadly force: (1) "the intent of the officer to inflict death or serious bodily harm"; and (2) "the probability, known to the officer but regardless of the officer's intent, that the law enforcement tool, when employed to facilitate an arrest, creates a 'substantial risk of causing death or serious bodily harm.'" *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir.1988) (quoting Model Penal Code § 3.11(2) (Proposed Official Draft 1962)). While the evidence indicates that direct firing of knee knocker rounds could constitute deadly force, the use of these "less lethal" munitions, when properly skip fired, is not ordinarily deadly force.

A warning was required here, however, because these weapons constitute potentially deadly force in that they have a substantial risk of causing death or serious bodily harm when direct fired. *See Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir.2001) ("Less than deadly force that

---

**9.** The mere fact that Defendants violated a police department regulation is not sufficient to impose liability under § 1983. *See Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Such a violation is, however, indicative of a disregard for Plaintiff's constitutional rights.

may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, when feasible."). This case is analogous to cases involving the use of police dogs. Though various courts have held that the use of these dogs, when properly trained and utilized, does not constitute deadly force, *e.g., Robinette,* 854 F.2d at 912, courts have nevertheless found that summary judgment is properly denied to defendants when no warning was given before using police dogs. *Kuha v. City of Minnetonka,* 365 F.3d 590, 597–98 (8th Cir.2004) (concluding "that a jury could properly find it objectively unreasonable to use a police dog trained in the bite and hold method without first giving the suspect a warning and opportunity for peaceful surrender"), *amending and superseding* 328 F.3d 427 (2003); *Vathekan v. Prince George's County,* 154 F.3d 173, 175 (4th Cir.1998) (holding that it is objectively unreasonable for a police officer to fail to give a verbal warning before releasing a police dog to seize someone); *Kopf v. Wing,* 942 F.2d 265, 268–69 (4th Cir.1991) (reversing summary judgment in favor of officer defendants where there existed a factual dispute regarding whether a verbal warning was given).

As the *Vathekan* court noted, the purpose of a verbal warning is to "enable innocent persons to exit the area and afford suspects an opportunity to surrender." *Vathekan,* 154 F.3d at 176. Here, taking the facts in the light most favorable to Plaintiff, Plaintiff and other innocent bystanders were given absolutely no opportunity to exit the area before the police opened fire on them. *See Deorle,* 272 F.3d at 1282 ("Our conclusion [that shooting

Deorle with a lead-filled beanbag round was objectively unreasonable] is strongly supported by Rutherford's failure to give Deorle any warning that he would be shot if he approached any closer, or any order to drop the can or bottle or stop where he was: Deorle certainly could not have been expected to comply with instructions that were never given to him."). This use of potentially deadly force without any warning is unsupportable, especially against a Plaintiff who was, at best, completely innocent of any crime and, at worst, a mere misdemeanant.[10] *See* O.R.C. § 2917.03 (rioting only a misdemeanor).

▇▇▇▇▇ The Court now comes to the more general question of whether the use of knee knocker rounds against the crowd was objectively reasonable under the circumstances or whether it violated Plaintiff's Fourth Amendment right to be free from excessive force. The Fourth Amendment requires that an officer's use of force be objectively reasonable, and courts must balance the consequences to the individual against the government's interests. *Graham v. Connor,* 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This inquiry is an objective one that requires consideration of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396–97, 109 S.Ct. 1865; *Darrah v. City of Oak Park,* 255 F.3d 301, 307 (6th Cir.2001). Allowances must be made "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

---

**10.** This is not one of the "exceptional cases where a warning is not feasible." *Kuha,* 365 F.3d 599–600. A rational jury could well find that the police could have provided additional

warnings over the SWAT loudspeaker and could have waited to fire for a period of time sufficient to allow law abiding bystanders to comply with a proper order to disperse.

evolving—about the amount of force that is necessary in a particular situation." *Graham* at 396–97, 109 S.Ct. 1865; *see also Pray v. City of Sandusky,* 49 F.3d 1154, 1159 (6th Cir.1995) (noting that police officers are "regularly forced to make critical decisions under extreme pressure") (quoting *Taylor v. Farmer,* 13 F.3d 117, 120 (4th Cir.1993)).

A reasonable jury could find, based on the facts as presented by Plaintiff, that the use of wooden baton rounds here was objectively unreasonable and that Defendants Zoretic, Wood, and Curmode each played a significant role in this use of force and thus should be liable to Plaintiff under § 1983. While Defendants unquestionably had a legitimate interest in dispersing the crowd that had gathered along Norwich Avenue, a reasonable jury could find that they did so more harshly than was necessary. Plaintiff has presented evidence that the crowd was peaceful and compliant, with only isolated occurrences of people throwing bottles and other items.

Plaintiff has also presented evidence that she heard no warning before shots were fired and that even the warnings that were given were inadequate either to apprise people of the danger that they faced or to give them time to disperse before being subjected to police force. Though the Court has already held that a warning was constitutionally required here, even absent such a holding, lack of warning is such a significant factor in determining whether a use of force is objectively reasonable that a jury could find, on that basis alone, that Defendants' use of force violated the Fourth Amendment. *See, e.g., Kuha,* 365 F.3d at 597–98 (noting that even where a warning has not been held to be required, "the presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog").

Plaintiff also points out that no less dangerous means of dispersing the crowd were attempted. For example, no warning shots were fired and the police chose not to use tear gas (CS grenades), even though tear gas has been proven effective in dispersing crowds. The crime at issue here was not at all severe: rioting is only a misdemeanor. O.R.C. § 2917.03. Should a jury credit Plaintiff's version of events, it would find little, if any, immediate threat to the safety of officers or others. Similarly, neither Otero nor anyone around her was actively resisting arrest. Under these circumstances, the use of knee knocker rounds constituted objectively unreasonable force.

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiff's § 1983 claims against Defendants Zoretic, Wood, and Curmode.

### c. *Defendant City of Columbus*

█ A municipality is liable under § 1983 only if the municipality itself caused the constitutional deprivation. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The doctrine of respondeat superior is inapplicable in § 1983 actions. *Id.* Rather, municipal liability can attach only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury. *Id.* at 694, 98 S.Ct. 2018. Moreover, the official policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983." *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. 2018); *see also Bd. of County Comm'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (noting that a plaintiff must show that

municipal action was taken with requisite degree of culpability and must demonstrate a direct causal link between the municipal action and a deprivation of federal rights); *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir.1993) (stating that plaintiff must identify the policy at issue, connect the policy to the governmental body, and show that injuries were incurred because of the execution of that policy) (citing *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987)).

■■■ Plaintiff argues that the City should be held liable under § 1983 for failure to supervise, failure to train, failure to investigate or discipline, and failure to develop plans and policies to deal effectively with a long known and recognized risk of isolated misconduct during student celebrations. Defendants contend that Plaintiff has failed to present evidence sufficient to support the key elements of her claims against the City. In particular, Defendants relate the details of the extensive training that prepares officers for riot situations and of the extensive planning that is part of the CDP's preparation for such situations. Defendants also assert that incidents that occurred after Plaintiff's injury—including other alleged constitutional violations by police on April 29, 2001, and the alleged failure to investigate or discipline—cannot be relevant to whether a City policy or custom caused Plaintiff's injury.

There are two distinct bases that support municipal liability in this case. First, liability may be based on the City policy that allows the use of wooden baton rounds as a "first resort"—before the use of less dangerous alternatives. Plaintiff has presented evidence that the City has a policy of discouraging the use of tear gas. Curmode testified that she was ordered by the Deputy Chief of the CDP to discourage the SWAT unit's use of tear gas. This order originated from the policy level of the City and therefore represents City policy, even though it is an unwritten policy. This order was a moving force behind the decision to use wooden baton rounds, or at least to use wooden baton rounds as the first resort, so soon after providing a warning. The Court has already held that the mere use of knee knocker rounds under the circumstances here was excessive force, at least under the facts as presented by Plaintiff. Whatever policy the City had regarding the use of riot guns loaded with wooden baton rounds allowed those guns to be used before extensive warnings, warning shots, or tear gas—all of which would have decreased the risk of serious bodily injury. The City therefore had a policy that caused the excessive force, thereby causing Plaintiff's injury.

The second ground for municipal liability here is based on the City's ratification of the unlawful conduct. Defendants are correct that, generally speaking, evidence of later events cannot establish that a given violation was caused by an official custom or policy. *See Joy v. City of Dayton,* No. C–3–90–132, 1991 WL 1092505, at *9–10 (S.D.Ohio June 28, 1991); *see also Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994) (finding insufficient evidence that the City's failure to investigate unconnected misconduct was the moving force behind the instant constitutional violation). A municipality may, however, ratify its employees' acts—thereby subjecting itself to § 1983 liability—by failing meaningfully to investigate those acts. *Wright v. City of Canton,* 138 F.Supp.2d 955, 966 (N.D.Ohio 2001); *see Leach v. Shelby County Sheriff,* 891 F.2d 1241, 1246–48 (6th Cir.1989); *Marchese v. Lucas,* 758 F.2d 181, 188 (6th Cir.1985). Viewed in this light, evidence that a municipality inadequately investigated an alleged constitutional violation can be seen as evidence

of a policy that would condone the conduct at issue.

In *Marchese*, a prisoner who had threatened a police officer was twice beaten while in police custody. The sheriff failed either to investigate the incident or to punish the officers involved. The court initially noted that even though the sheriff was not present during the beatings, he was sued in his official capacity and, "in that capacity, he had a duty to both know and act." *Marchese*, 758 F.2d at 188. The court concluded that the official policy of the sheriff and the county (1) did not require appropriate training or discipline of the police officers, and (2) would not engender either investigation or sanctions against officers when such an assault occurred. The court stated, "It is this latter official policy which we also regard as ratification of the illegal acts...." *Id.*

In *Leach*, the court held that the Shelby County sheriff—both supervisor and final policymaker—"implicitly authorized, approved, or knowingly acquiesced in the action of the responsible jail personnel as shown by the fact that ... he failed subsequently to punish the responsible individuals." *Leach*, 891 F.2d at 1246 (internal quotation marks omitted). The court went on to find the sheriff's failure to investigate an incident of mistreatment of a paraplegic prisoner or to punish the responsible parties to be persuasive evidence of a municipal policy of deliberate indifference to the needs of paraplegic prisoners at the Shelby County Jail. The court stated that the sheriff had, in effect, ratified the actions of the county employees responsible for the constitutional violation.

In *Wright*, the plaintiff offered evidence that the investigation into an alleged excessive use of force was not designed to discover what actually happened. Most notably, the officer conducting the investigation never interviewed the emergency room doctor who treated the plaintiff's injuries. The court held that the plaintiff had established a municipal liability claim because he had shown that the investigation was so inadequate as to constitute a ratification of the officers' alleged use of excessive force.

Here, Plaintiff has adduced evidence that the City has a policy of dealing with citizen complaints in such a way as to virtually ensure that offending officers will not be disciplined for their misconduct. The City's failure to discipline any officer based on Otero's injury thus constitutes a ratification by the City of the unconstitutional conduct that caused that injury. According to the contract between the City and the Fraternal Order of Police, a citizen complaint must be received by the City within 60 days of the date of the alleged event giving rise to the complaint. If a complaint is received outside of that deadline, the complaint will be classified as unfounded. Exceptions to this rule are (1) if the allegations of conduct are criminal on their face; (2) if the allegations of conduct could reasonably lead to criminal prosecution; and (3) where the complaint alleges non-criminal conduct that is the same or similar to conduct that resulted in the recent termination of a member, where the termination was upheld by an arbitrator or the Civil Service Commission. The investigation of a citizen complaint must be concluded within 90 days after the date the complaint was received by the City.[11] If this deadline is not met, no officer may be disciplined based on the investigation.

11. This deadline may be extended by the local lodge of the Fraternal Order of Police upon written request from the City.

Because the officer who took Plaintiff's complaint filled out an "incident report"—such as would be used to inform the police of any unlawful incident—rather than a "citizen complaint"—used to complain to the CDP about the conduct of an officer—the City's ability to discipline any officer based on that complaint was dramatically decreased. The incident report at issue here was not converted to a citizen complaint until after the 60 day time period had already run. The City thus was precluded from disciplining any officer unless it made a determination that the officer's conduct was either criminal on its face or reasonably could lead to criminal prosecution. Furthermore, the late receipt of Otero's complaint meant that the 90 day investigation period was curtailed, leading to a less than thorough investigation. Plaintiff has alleged that the use of an incident report rather than a citizen complaint was not an accident, but was deliberately done as part of a City policy to insulate officers from administrative disciplinary action. If Plaintiff's claims are true, then the City, as in *Wright*, has conducted the sort of inadequate investigation sufficient to subject it to liability based on ratification. While in *Wright* the investigation was inadequate because it was designed not to uncover violations, here the investigation was inadequate because it was designed *not* to result in any disciplinary action.

Although the remainder of Plaintiff's contentions as to municipal liability are not persuasive, the Court **DENIES** Defendants' Motion for Summary Judgment as to Defendant the City of Columbus based both on the City's policy allowing the use of riot guns with wooden baton rounds before other, less extreme measures were used and on the City's ratification of the unconstitutional conduct that injured Plaintiff.

### 2. Plaintiff's Assault and Battery Claims

Plaintiff contends that her state law claims for assault and battery against Defendants Brintlinger, Zoretic, Wood, Curmode, and the City should stand because there is a genuine issue of material fact as to whether these Defendants acted "with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(5) (political subdivision liability); O.R.C. § 2744.03(A)(6)(b) (liability for employees of political subdivisions). Defendants offer no arguments with regard to Plaintiff's state law claims.

Section 2744.03 of the Ohio Revised Code provides limited immunity to political subdivisions and their employees as long as the employees did not act "with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03. "Malice" is the willful and intentional design to injure or harm another, usually seriously, through conduct that is unlawful or unjustified. *Wright v. City of Canton*, 138 F.Supp.2d 955, 967 n. 8 (N.D.Ohio 2001) (citing *Cook v. City of Cincinnati*, 103 Ohio App.3d 80, 658 N.E.2d 814, 821 (1995), and *Piro v. Franklin Township*, 102 Ohio App.3d 130, 656 N.E.2d 1035, 1041 (1995)). "Bad faith" includes a dishonest purpose, conscious wrongdoing, or breach of a known duty through some ulterior motive. *Id.* (citing *Cook*, 658 N.E.2d at 821, and *Piro*, 656 N.E.2d at 1041). "Wanton" misconduct refers to one's failure to exercise any care whatsoever. *Id.* (citing *Fabrey v. McDonald Village Police Dep't*, 70 Ohio St.3d 351, 639 N.E.2d 31, 35 (1994), and *Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977) (syllabus)). "Reckless" refers to conduct that causes an unreasonable risk of harm and is "substantially greater than that which is necessary to make his conduct negligent." *Id.* (quoting *Thompson v.*

*McNeill,* 53 Ohio St.3d 102, 559 N.E.2d 705, 708 (1990)).

Plaintiff has presented sufficient evidence to withstand summary judgment as to her state law claims against Defendants Brintlinger, Zoretic, Wood, Curmode, and the City. As noted, *supra,* Plaintiff has adduced sufficient evidence to create a genuine issue of material fact as to whether Defendant Brintlinger direct fired a wooden baton round that caused her injury. Under the circumstances, where Plaintiff was not threatening anyone or even acting illegally, direct firing a wooden baton round at Plaintiff could be found to constitute wanton, reckless, and/or malicious behavior. Similarly, because both Zoretic and Wood were in a position and had a responsibility to control Brintlinger's firing and failed to do so, a reasonable jury could find that they recklessly and wantonly participated in the serious injuries inflicted upon Plaintiff. Defendant Curmode not only had general supervisory responsibility, but she did not assure that adequate warnings were given before wooden baton rounds were fired and she implemented a City policy not to use tear gas or other less harmful alternatives before gas guns were used. A jury likewise could find these actions to have demonstrated bad faith and wanton and reckless disregard for Plaintiff's safety. The refusal of various SWAT and other officers to provide medical assistance to Plaintiff after she was shot reinforces the conclusion of malicious, wanton, and/or reckless conduct. Plaintiff's state law claims against the City should survive because, for the reasons stated above, she has created a genuine issue of material fact as to whether the "judgment or discretion" that caused her injury "was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner." O.R.C. § 2744.03(A)(5).

Because Plaintiff has established the existence of a genuine issue of material fact as to whether the involved officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner in causing her injury, Defendants' Summary Judgment Motion is **DENIED** as to Plaintiff's state law claims against Defendants Brintlinger, Zoretic, Wood, Curmode, and the City.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's Motion for Summary Judgment on Liability. Defendants' Motion for Summary Judgment is **GRANTED** as to Defendants Mathias, White, Rich, Singer, Moss, Lawrence, Aurentz, Scanlon, Dickerson, Ey, Coffman, Buchacevich, Petty, McDaniel, Reffitt, Miller, Porter, Groom, Henterly, Hope, Brown, and Mattei and **DENIED** as to Defendants Brintlinger, Zoretic, Wood, Curmode, and the City.

**IT IS SO ORDERED.**